## J. ALBERT HUGHES, Receiver,

### vs.

## MODEL STOKER COMPANY.

*Building contracts: work to be approved and accepted by a third party; recovery; rejection; good faith; burden of proof.*

Where, by a building contract, the quality and acceptability of the work is to be left to the approval of a third party, whose estimates and decisions are to be final and conclusive, there can be no recovery for work done, unless acceptance by such third party be shown, or unless it be shown that the work was rejected by him in bad faith and fraudulently.        p. 289

In such a case, in the absence of fraud or bad faith, the decisions of such third party are not subject to review by the courts.
p. 289

*Decided November 11th, 1914.*

Appeal from the Circuit Court of Baltimore City. (DAWKINS, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*W. H. DeCourcy Wright* and *Jacob France,* for the appellant.

*Lewis W. Lake* and *Albert H. Bartholomai,* for the appellee.

Burke, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court of Baltimore City overruling exceptions to an auditor's account, and finally ratifying and confirming the account in so far as it allowed a dividend upon the claim of the appellee, filed in the receivership proceedings of Thomas C. Basshor Company, a corporation, pending in that Court. The evidence was taken in open Court, and although the record is quite large, exhibiting great conflict upon a number of questions of fact, the legal principle which should control the case is well recognized and its application free from difficulty upon the established facts.

On the 6th day of September, 1910, the Thomas C. Basshor Company entered into a contract with the Mayor and City Council of Baltimore by which it agreed, among other thing, "to furnish all labor and materials necessary to completely install the four (4) 250 H. P. water tube steel boilers, together with mechanical stokers, in the boiler room of the power house on the grounds of Bay View Asylum in strict accordance with this specification and accompanying drawings, for the sum of seventeen thousand four hundred and ninety dollars ($17,490.00).

For the mechanical stokers the sum of thirty-nine hundred dollars ($3,900.00) is included in the above amount."

It was provided that the contract was "subject to all the conditions, covenants, stipulations, terms and provisions contained in certain specifications, a copy of which is hereto attached, and in all respects made a part hereof, together with the drawings therein referred to, etc."

The specifications which were attached to the contract are contained in the record, and are precise and elaborate. The portions of the specifications which bear upon the question involved in this case are here transcribed:

"First—All specifications, drawings, and notes on drawings are to be accepted as a whole, and not separately, as they are intended to illustrate and explain each other and the work to be done, and anything omit-

ted in the one or the other which is necessary for the completion of the work in a perfectly satisfactory manner shall be done by the contractor as if it was both shown and specified, *and all conditions and requirements of these specifications shall be equally binding on sub-contractors for all branches of work herein mentioned, as though separately specified under each separate branch thereof.*

"Second—Each boiler must be guaranteed to develop under ordinary working conditions 250 H. P. at the rating of 34.5 pounds of water per H. P. from and at 212 degrees F. into dry steam at 125 pounds, the gauge pressure at an evaporating economy of not less than 10.5 pounds of water per pound of dry coal, using a good commercial grade of bituminous coal.

"Each boiler must further be guaranteed to develop under test conditions, with a draft of not over $\frac{5}{8}$ inch of water in the smoke breeching near boilers, a capacity of 33% *above* the heretofore normal capacity of the boilers.

"Third—Each boiler is also to be equipped complete with a Jones automatic underfeed stoker or a stoker of fully equal merit and capacity. The entire equipment to be complete, including blower with direct connected engine of sufficient size to operate all stokers, all steam and drip piping, underground blast piping and lower sections of boiler fronts.

"Fourth—The accompanying drawing shows the available space for the installation of the four boilers as specified and the assigned floor space must not be exceeded. The ceiling over boiler room will be fireproof, and the opening for the passage of the main smoke flue into stack will be provided under the building contract. The successful bidder, however, is required to submit detail shop drawings and specifications showing the arrangement and construction of the boilers and smoke breeching he proposes to install, and giving all detail dimensions of all construction parts and the amount of effective heating surface and

grate surface contained in each boiler. Under effective heating surface shall be understood the outer surface of the water tubes and fire exposed parts of headers and steam drums as far as water covered.

"Fifth—To prevent disputes and litigations, the Inspector of Buildings shall in all cases determine the amount, *quality and acceptability of the work* which is to be paid for under the contract; *shall determine all questions in relation to said work and the performance thereof, and shall in all cases decide every question which may arise relative to the fulfillment of the contract on the part of the contractor.* His estimate and decision shall be *final and conclusive,* and in case any question shall arise between the parties touching the contract, such estimate and decision shall be a condition precedent to the rights of the contractor to receive any moneys under the contract."

The Model Stokers, or furnaces contracted to be furnished by the Basshor Company were supplied by the appellee and installed under its instruction. The contract price of the four furnaces to the Basshor Company was $3,525.00, on which that company paid $1,259.82, leaving a balance of $2,265.18 due on the contract price. After the furnaces had been installed and the heating plant put in operation, the furnaces were condemned by the inspector of buildings and were removed by the city and replaced by other furnaces. The city refused to pay the Basshor Company for the furnaces and charged it with a large sum for removing the furnaces and installing new ones.

On December 20, 1911, Mr. Clarence E. Stubbs, the inspector of buildings, wrote the Basshor Company as follows:

"After having made several tests of the boilers and stokers at the Bay View power house, I find that said stokers are not constructed for the capacity of the boilers installed at said power house, in that they have failed to meet with the requirements of the specifications for said boilers and stokers.

"You are hereby notified to remove said stokers and replace the same by stokers immediately that will meet with the requirements of the specifications.

"It is imperative that one battery, consisting of two (2) boilers, be operated day and night from this date on, until acceptance of the power plant. Said boilers to be operated at your expense."

On December 27, 1911, Mr. Stubbs wrote the Basshor Company another letter, as follows:

"It has been reported to me that you have workmen at the Bay View power house cutting out the grates of the boilers, for the purpose of installing blower in connection with present furnaces.

"I notified you on December 20, 1911, that the present furnace would have to be removed and that other furnaces of entirely different make, equal to the ones specified, or the stokers specified in the specifications, for the installation of the above boilers, etc., would have to be installed in place of the present stokers.

"Under the terms of the specifications which form a part of your contract and bond under 'General Conditions,' page 7, I hereby notify you to remove the present stokers now in place and replace stokers immediately that will meet with the requirements of the specifications, and that during the removal of said rejected stokers, it is imperative that one battery consisting of two (2) boilers, be operated day and night from this date on.

"Unless said rejected work and materials are removed from the premises within three days from date hereof (December 27th, 1911), I shall enter upon and complete the work as the interests of the city demand, and the payments under the contract shall cease.

"I have sent a copy of this letter to your bonding company.

"I also understand that there has been only one man firing the boilers for the past few days, and that

it will be impossible for him to keep steam up when the engines and generators are turned over.

"Also must notify you that the receiver installed by you in Insane Asylum some time ago is not working properly."

Mr. Stubbs testified in the case, and said he disapproved of the furnaces for the reason that they did not work properly and could not get up sufficient steam to heat the buildings; that he had complaints about the plant not heating properly, and that he made several visits to the institution, and "I saw from the gauge myself that the steam could not get up more than 30 pounds on the gauge, which was not sufficient to carry the steam or to force the steam through the tunnels to the buildings for which this plant was erected to heat. * * * From noticing the gauge and from the several complaints that I had had from time to time that they were not getting sufficient steam, and after having seen the premises, seeing myself that the gauge would not register over 30 pounds of pressure, I took it upon myself at that time, upon the advice of Mr. Adams, and also Mr. Fairley, who was called in as a consulting engineer, to suggest flat shaking grates which were afterwards installed after the stokers were removed, and since that time the stokers were removed and the flat shaking grates have been installed I haven't had any complaints about the pressure of steam there. * * * Mr. Cotton told me from time to time if I permitted him to do this, that or the other it would be all right, and one of the things he did was the putting in of a fan creating a forced draft. He said he would get a proper amount of steam to heat the buildings and also turn over the generators to operate the elevators. None of them worked properly, and I had to resort, after I found out they could not get up sufficient steam, to removing the stokers."

Mr. Stubbs testified that he acted practically upon his own judgment formed from personal observation of the working of the furnaces in ordering their removal, although he advised

with Messrs. Adams and George E. A. Fairley, consulting engineers. He said that Mr. Cotton, the president of the appellee company, was at the institution for about a month trying different things.

The furnaces were sold to the Basshor Company by O. C. Woolson, the general sales agent of the appellee company and were to conform to the specifications.

We find as a fact that the appellee had knowledge of the specifications and that a copy thereof was shown to Mr. Woolson and were in his possession before the contract was finally accepted.

The appellee must, therefore, be held bound by the terms and provisions of the specifications, one of which was that they should be equally binding on *sub-contractors* for all branches of work therein mentioned. By another provision of the specifications it was declared that the inspector of buildings should "in all cases determine the amount, quality and acceptability of the work," and that his estimate and decision should be *final and conclusive.*

The inspector of buildings did decide that the furnaces were not acceptable, that they did not conform to the specifications, and ordered their removal. His decision, in the absence of fraud, or bad faith—and there is no allegation or evidence of either in the record—is not reviewable by the Courts. The Courts of all the States, except Indiana, hold that an express stipulation, such as the one contained in these specifications, is valid and binding, and that the decision of the person designated to decide the question in dispute is, when rendered, conclusive of the matter passed upon, in the absence of fraud or bad faith.

In *Lynn* v. *B. & O. R. R. Co.,* 60 Md. 404, which was an action to recover damages for the breach of a written contract by which the plaintiff agreed to furnish a certain quantity of ice to the defendant. The contract contained a provision that the ice was to be good, clear, solid stock, not less than six inches thick, clear of snow, and subject to the inspection and approval of an agent of the company. J. F.

Legge was appointed by the company to inspect and approve the ice. The plaintiff submitted to Legge samples of the ice he proposed to furnish which Legge rejected and no ice was ever, in fact, delivered. The two following prayers were offered by the defendant and granted by JUDGES ALVEY and MOTTER in the lower Court:

First: If the jury find that in pursuance of the contract in evidence the said N. S. Hill selected John F. Legge, an agent of the defendant, to inspect and approve the ice offered by the plaintiff, and that said Legge accepted the duty and undertook its performance, and that he (plaintiff) submitted specimens of ice from time to time to the inspection of Legge, then in order to recover under the pleadings in this case it is incumbent on the plaintiff to prove that the said Legge did approve of ice so submitted for his inspection and approval, unless the jury further find that Legge fraudulently, or in bad faith, rejected the ice offered by the plaintiff.

Second: That according to the terms of the contract between the plaintiff and defendant, read in evidence, it was the duty of the said N. S. Hill to have appointed some agent of the company (defendant), to inspect and approve of the ice to be furnished by the plaintiff; and if the jury find that John F. Legge was selected and appointed by N. S. Hill to perform that duty, and that Legge was an agent of the defendant, and that Legge accepted the appointment, and undertook the duty assigned him, and that the plaintiff accordingly, from time to time, submitted to Legge specimens of ice for his inspection and approval; and further find, that he did inspect the ice offered by the plaintiff, for the acceptance of the defendant; but that he did not approve of such ice, and rejected it; then, even though the jury may believe from the evidence that Legge *unreasonably rejected the ice,* the plaintiff cannot recover in this action unless the jury find that the action of Legge in rejecting the ice offered was *fraudulent or done in bad faith.*

Both prayers were approved on appeal, and the rule of law which they announce has been consistently followed by this Court.

In considering the fourth prayer, the Court, speaking through Judge Miller, said: "By granting the fourth prayer, the jury were instructed that it was not sufficient for them to believe, from the evidence, that Legge unreasonably rejected the ice, unless they find that his action in this respect was fraudulent or done in bad faith; and by the fifth instruction they were told that it is not enough to establish the fraud charged; that they may believe, from the evidence, that Legge rejected ice which they may believe he ought to have accepted, or that he rejected ice which, in their opinion or that of others, corresponded in all particulars with that described in the agreement; but in order to maintain the charge of fraud under the pleadings and evidence in this case, they must find that his judgment and action was the result of fraud or bad faith, as described in the preceding prayers. While, as we have already said, the condition precedent in this contract will be dispensed with by proving that the judgment of the agent to whom the parties entrusted the duty of inspection and approval was the result of his fraud or *mala fides,* it is plain that nothing less will suffice."

The appellee contended and offered evidence tending to prove that the furnaces did conform to the requirements of the contract, and that their failure to heat the building was due to conditions for which it was in no way responsible. But for the reasons stated, its contentions are not open to consideration in this Court. They are finally and conclusively determined adversely to the appellee by the decision of the inspector of buildings. It follows that the exceptions to the allowance of the appellee's claim should have been sustained and that their claim should have been rejected.

> *The order reversed and cause remanded that an order may be passed in conformity to this opinion; the appellee to pay the costs above and below.*