CHARLES BURTON BUILDERS, INC. ET AL. *v.*
L & S CONSTRUCTION COMPANY,
INC. ET AL.

[No. 167, September Term, 1970.]

*Decided December 10, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Abraham Chasanow* for appellants.

*William E. Brooke* for appellee L & S Construction Company, Inc.

Submitted on brief by *Gordon C. Murray* for Globe Indemnity Company, other appellee.

BARNES, J., delivered the opinion of the Court.

Charles Burton Builders, Inc., one of the appellants and a defendant below (Owner or Burton Builders), challenges before us a judgment for $31,949.98 entered against it by Judge Parker, sitting as the Circuit Court for Prince George's County, without a jury, in favor of the appellee L & S Construction Company, Inc. (L & S or Contractor) and the action by that Court in dismissing the counterclaim for $35,350.00 of Burton Builders. The controversy arose out of the failure of Burton Builders, as Owner, under a written contract entered into between the Owner and the Contractor on April 19, 1963, for the construction of storm drainage and street paving in the Lakecrest subdivision of the City of Greenbelt, Maryland, to pay the balance allegedly due by the Owner to the Contractor for the work covered by the contract and certain extra work performed by the Contractor. The Owner's counterclaim is for alleged liquidated damages of $35.00 a day for a claimed delay by the Contractor of 1010 days. In the action below the Fireman's Fund, Inc., the remaining appellant, was joined as a party defendant as the Owner's bonding company. The Globe Indemnity Company, the bonding company for the Contractor, was joined as a party in a cross-claim filed by the Owner, Burton Builders. The Owner raises four contentions before us, *i.e.*, (1) the trial court disregarded the written contract in arriving at its verdict; (2) the decision of the trial court was contrary to the evidence; (3) the judgment was excessive and improper; and, (4) the trial court erred in dismissing the Owner's counterclaim. We will consider these four contentions in the order mentioned.

The written contract of April 19, 1963, was prepared by Ben Dyer Associates, Inc., an engineering firm originally employed by the Owner and later employed by the City of Greenbelt to act as its engineer in connection with the work done under the contract. The total contract price was $47,862.70 and the work to be done under it was to construct storm drainage and street paving on Lakeside

Drive, Maplewood Court, Olivewood Court and Pinecrest Court in the Lakecrest Section of the City of Greenbelt. Nineteen items were listed with the unit, quantity, unit price and total price given for the separate items for the total contract price. The work to be done was divided by the $47,862.70 contract into three sections. Section 1 covered all of Maplewood Court and part of Lakeside Drive, which was to be constructed immediately. Section 2 covered all of the Olivewood Court and a part of Lakeside Drive. Section 3 covered all of Pinecrest Court and the remaining portion of Lakeside Drive. Sections 2 and 3 were to be constructed before September 30, 1963. In the Proposal Page of the contract, however, there was a statement that the contract would be completed within 60 days with the words written in ink, "Quotation As Directed", directly below and with a further provision that the contract time would apply to Section 1 only, and that Sections 2 and 3 would be completed "within a reasonable time when notified." In addition to the three sections mentioned, the contract also provided that the Contractor would put in storm drains.

The contract consists of the Proposal of four single-spaced typewritten pages (with certain insertions in ink), four pages of "Special Provisions" (which control if in conflict with the General Provisions) and 15 pages of General Provisions, containing 49 separate single-spaced mimeographed provisions of the general "boiler plate" variety, adapted to the contract by the typewritten insertions. There are two single-spaced typewritten pages headed "CONTRACT" which incorporated by reference the other portions of the contract, and this is duly signed by the respective parties on page 2 (marked page "21") of the contract. The Performance Bond, executed by the Globe Indemnity Company is also included in the contract as pages 22 and 23. Contract Drawing No. J-61098 is mentioned as part of the contract in the first paragraph of the Special Provisions.

The Special Provision, Sec. 3.03, under the heading "JURISDICTION," provides that:

"Work to be performed under this contract is located within the City of Greenbelt, Maryland, and all work must be prosecuted and completed to the satisfaction of the City Manager."

Sec. 3.17 provides:

"The amount of liquidated damages as specified under paragraph 13 of the General Provisions of this Contract will be $35.00 per day and will be paid to Charles Burton Builders Inc."

In the General Provisions the following important provisions are set forth:

Sec. 1, "DEFINITIONS," subsection (c) provides that: "ENGINEER shall mean *'City Manager—Inspection Ben Dyer Associates, Inc.—Engineering'* or *'their'* duly authorized agents." The portions of this section in italics were inserted in typewriting on the mimeographed copy.

Subsection (e) provides that:

"Whenever, in the specifications or upon the drawings the words DIRECTED, REQUIRED, PERMITTED, ORDERED, DESIGNATED, PRESCRIBED, or words of like import are used, it shall be understood that the direction, requirement, permission, order, designation, or prescription of the Engineer is intended; and similarly the words APPROVED, ACCEPTABLE, SATISFACTORY or words of like import, shall mean approved by, or acceptable or satisfactory to the Engineer, unless otherwise expressly stated."

Sec. 5, "WORK TO BE DONE AND MATERIALS TO BE FURNISHED," provides that the Contractor shall do the work and furnish the necessary materials necessary or proper to do the work in the manner called for by the specifications and "within the contract time." The Con-

tractor shall complete the work and any extra work "to the satisfaction of the Owners and the Engineer and in accordance with the specifications and drawings."

Sec. 8, "SUPERVISION AND DIRECTION OF WORK," provides that the "work shall be under the general supervision of the Engineer."

Sec. 9, "DECISIONS AND EXPLANATIONS BY ENGINEER," provides:

"(a) The Engineer shall make all necessary explanations as to the meaning and intent of the specifications and drawings, and shall give all orders and directions, either contemplated therein or thereby or in every case in which a difficult or unforeseen condition arises during the prosecution of the work. Should there be any discrepancies in or between, or should any misunderstanding arise as to the import of anything contained in the drawings and specifications, the decision of the Engineer shall be final and binding. Any errors or omissions on the drawings or in the specifications may be corrected by the Engineer when such corrections are necessary for the proper fulfillment of their intent as construed by him.

"(b) The Engineer shall in all cases determine the amount, quality and acceptability of the work to be paid for under the contract, and shall decide all questions in relation to said work. His decision and estimate shall be final and conclusive, and in case any question shall arise between the parties touching the contract, such decision and estimate shall be a condition precedent to the right of the Contractor to receive payment under that part of the contract which is in dispute.

"(c) Decisions and interpretations will be rendered by the Engineer as promptly as pos-

sible, but should delay occur, for any reason, the Contractor shall have thereby no claim for damage or extra compensation."

Sec. 11, "LINES, GRADES, ELEVATIONS, ETC.," provides that the "Engineer will give all necessary lines, grades and elevations for the guidance of the Contractor . . . ." This section also provides that any work done "without lines, levels and instructions having been given by the Engineer, will not be estimated or paid for except when such work is authorized by the Engineer."

Sec. 12, "TIME OF BEGINNING AND COMPLETION," provides that the Contractor shall begin the work "within 10 calendar days after the service of written notice from the Engineer so to do and shall diligently prosecute the same, so that it shall be fully completed within the number of days stated in the proposal, after service of written notice from the Engineer to proceed with the work."

Sec. 13, "DEFAULT IN COMPLETION," provides:

"(a) The Engineer shall determine the number of calendar days that the Contractor is in default in completing the contract and shall certify the same to the Owners in writing. For each calendar day so certified, the Contractor shall pay the Owners a sum specified in the Special Provisions, which sum is hereby agreed upon, not as a penalty, but as liquidated damages which the Owners will suffer by reason of such default; provided, however, that the Owners may, as hereinafter provided, extend the time for completion of the work beyond the contract time. The Owners shall be fully authorized and empowered to deduct and retain the amount of any damages, determined as hereinbefore stipulated, for each day that the Contractor shall be in default in completing the work after the time fixed in the contract, or after any later date to

which the time for completion may have been extended by the Owners, from any moneys due or to become due the Contractor under the contract, at any time after such damages are so incurred. The permitting of the Contractor to finish the work or any part of it after time fixed for its completion, or after the date to which the time for completion may have been extended, shall in no wise operate as a waiver on the part of the Owners of any of its rights under the contract."

Sec. 14 "EXTENSION OF TIME," provides that claims for extension of time shall be made by written notice by the Contractor and certified by the Engineer "in writing to be just and proper."

Sec. 18, "LAWS AND REGULATIONS," in effect, states that in all operations connected with the work, all ordinances of the town in which it is done as well as all federal, state and county laws "must be respected and strictly complied with" by the Contractor.

Sec. 22, "DEFECTIVE WORK," requires the Contractor to remedy work found to be defective or to have been damaged at any time before the final acceptance of the whole work, without extra compensation, even though not due to any act, default or negligence of the Contractor.

Sec. 34, "WAIVER OF CONTRACT," provides that acceptance of the work by the Owners or the Engineer shall not operate as a waiver of any portion of the contract or any right to damages provided in the contract.

Sec. 35, "IMPLIED WORK," requires the Contractor to perform, without extra compensation, incidental work fairly implied as included in the contract and "which the Engineer shall judge to be so included."

Sec. 37, "EXTRA WORK," has eight subsections. Subsection (a) provides that the Contractor shall perform extra work ordered in writing by the Engineer for which

itemized statements and bills shall be delivered by the Contractor to the Engineer before the 5th day of the following month. The formula for computing the amount to be paid for the extra work is set forth, *i.e.*, (1) Wages of employees on the extra work plus 25% ; (2) materials at actual cost plus 10% ; and (3) rental of equipment "as the Engineer shall determine to be reasonable and fair."

Subparagraph (b) specifically eliminates certain allowances and charges from the calculation of the amount to be paid for extra work.

Subparagraph (c) states that the extra work shall be done as economically as possible with the use of current labor rates and the lowest market price for materials. The Owners may furnish materials and necessary equipment for the extra work and the Contractor will receive no allowance thereon.

Subsection (d) provides:

"The decision of the Engineer shall be final and binding upon all questions relating to extra work. If he shall deem that any extra work bill is unreasonable or improperly made up in any particular, he shall be empowered to require its revision and adjustment, in accordance with such terms as he shall judge to be fair and reasonable."

Subsection (e) states:

"The Engineer will certify to the Owners for payment proper bills, made out as above provided and submitted before the prescribed date, upon each written order for extra work. Payment, as approved, for the work done under each extra work order completed during any month will be made upon the current estimate for work completed under the contract during that month, and shall be subject to all the provisions of the contract relating to the payment of current estimates. Should the work under any extra work

order remain uncompleted during any month, payment thereupon shall not be made until the current estimate is paid for the month during which the work under said extra work order is completed. The Contractor shall not be entitled to any claim for interest on any bill for extra work on account of delay in its approval."

Sec. 47, "FINAL ESTIMATE," provides for the making by the Engineer of a final written estimate when he deems that the Contractor has fully completed the work and shall certify to the Owners the completion of the work and the amount of the final estimate.

The principal witness for the Contractor at the hearing before the trial court was Alfred Nelson Myers, Jr., Vice President of L & S when the contract was executed and President of L & S at the time of trial. Mr. Myers explained the reason for the ambiguity in the contract in regard to the completion date of the various sections. The Owner was building houses in sequence in its development of a subdivision. It could get a better price on three sections than it could on one section, even though it did not intend to do all the work at one time. Accordingly, the words "as directed" were inserted in ink on the Proposal pages of the contract because Sections 2 and 3 were not ready. When the contract was submitted for bids, the Contractor was furnished a set of plans (Plaintiff's Exhibit 2). After its bid was made, the plans were revised to add sidewalks and driveways, a price agreed upon for this, and a revised plan (Plaintiff's Exhibit 3) was furnished. Mr. Myers marked the location of the storm drain on the original plan (Plaintiff's Exhibit 2) in red and Sections 1, 2 and 3 in green on this plan.[1]

---

1. The plans show Lakeside Drive running approximately north and south. Maplewood Court, Olivewood Court and Pinecrest Court are all streets on the west side of Lakeside Drive and end in cul-de-sacs. The longest one is Maplewood Court, the shortest Olivewood Court. Pinecrest Court curves in a northwesterly direction after its intersection with Lakeside Drive. On both sides of all of these streets are building lots of various sizes obviously subdivided for residential building. The lake lies to the north-

The Contractor began work on the storm drain on April 23, 1963. This work was finished on May 25, 1963, except for tops and throats on the inlets which, Mr. Myers stated, had to tie in with the curb, gutter and sidewalk. While the Contractor was working on the storm drain, it encountered a waterline on Lakeside Drive at a different elevation than that shown on the plan. The plan was revised by the Washington Suburban Sanitary Commission on May 7, 1963. Mr. Myers marked the date of the revision in red on Plaintiff's Exhibit 3. There were no complaints about this as part of the work and the storm drains "were acceptable."

The Contractor was not permitted to begin the work on the streets until the Engineer had furnished the grade sheets.[2] These grade sheets were furnished the Contractor by the Engineer for Section 1 on May 21, 1963. The Contractor began work on Section 1 the same day by grading and thereafter installing curbs, gutters, sidewalks and driveway aprons. Then the Contractor laid the gravel base and the base paving. It also did certain undercutting to straighten up the bottom in accordance with an order of the Engineer and a Mr. Snyder, the general superintendent of the Owners. Photographs were offered showing this aspect of the work. The Contractor left a uniform grade for sod which was to be done under other contracts and which was necessary for acceptance of the street on behalf of Greenbelt.

On July 15, 1963, the Contractor submitted to the Owner a bill for work as of that date for $24,913.17, in-

west of all of the streets approximately 150 feet from the westerly end of the cul-de-sacs at the westerly end of Maplewood Court and Olivewood Court.

2. The grade sheets are on forms of Ben Dyer Associates, Inc. After identifying the location and the contract, with notations by whom computed and checked, the location of hubs, together with the date, there are seven separate columns in which the station numbers are given, existing, approved grade and hub, under "elevation." There are three additional columns under the heading "Grade for"—i.e., "Cut (below hub)," "fill (above hub)" and "Remarks." The dates on the grade sheets verify Mr. Myers' testimony in regard to when they were supplied the Contractor by the Engineer.

cluding curb, gutter, driveway, sidewalk and gravel base. The Contractor had not yet done the asphalt surface and this was not included in the bill submitted. The work which was included in the bill had been done by the end of June 1963, but the submission of the bill was delayed because the work had to be approved by the Engineer.

The paving in Section 1 was completed by the Contractor on July 29, 1963, which included everything to be done except the asphalt topping on Lakeside Drive. It included the asphalt base on Lakeside Drive; but the asphalt topping on Lakeside Drive was held up at the Owner's request so that it would not be torn up or injured by the work then being done by the Owner on the remainder of its job.

Mr. Myers testified further that the work on Section 1 was done in 59 days inasmuch as there were 69 days between the date of the notice, May 21, and the date of completion, July 29; and the Contract (General Provisions, Sec. 12) provided that work was to begin within 10 days after the service of written notice by the Engineer.

Lakeside Drive, where the Owner had directed that the asphalt topping not be put down, was to be the haul road into the job where the Owner was building houses; and if the asphalt topping had been laid, it would have been broken up. Mr. Myers described the putting down of the topping as putting part on the street to make it look pretty when one finished using it and the Owner had decided to do it this way because it anticipated that it would "be a couple of years in finishing this thing."

The Contractor received the grade sheets from the Engineer for Section 2 on October 9 and 10, 1963. About that time it started the work and did curb, gutter, sidewalk, driveway aprons and gravel base that winter so that people could get in and out of their houses, but it got too cold to lay the asphalt, so that the Engineer and Mr. Snyder, the Owner's general superintendent, determined that the paving be done the following May of 1964. The work on Section 2 was completed on May 25, 1964, except again for the final asphalt topping on Lakeside Drive,

in that building was still going on in back of that street.

The Engineer furnished the Contractor a grade sheet for Section 3 on July 7, 1964. This section was finished on October 27, 1964, except again for the final topping on Lakeside Drive because the Owner was still building houses.

On November 30, 1964, the Contractor submitted a bill to the Owner for the work completed as of that date for $45,696.70, less a credit for $18,809.13, leaving a balance due of $26,887.58. At this time, Mr. Myers testified, the only things remaining to be done were the topping on Lakeside Drive and some punch list items of repairs to be done sometime in 1965.

There was a punch list of relatively minor items prior to the final paving as a result of an inspection on July 15, 1965. Mr. Myers, on behalf of the Contractor, wrote Charles Bresler, president of the Owner, on July 19, 1965, advised the Owner that on July 15, 1965, James K. Giese, the Greenbelt City Manager, James H. Hummer, Jr., the engineer from Ben Dyer's office, had gone over the job with Mr. Myers and had agreed upon corrections needed to complete the work; but Mr. Myers asked for a statement that the Contractor would be paid for this as extra work and understood that the Contractor was interested in getting the work completed. No reply to this letter from the Owner was received by the Contractor, but the Contractor did the work in order to get the topping done and made no charge for it.

Mr. Myers, on July 27, 1965, took photographs and made notations in regard to the damage being done to the curb and gutter during the construction of houses by the Owner and had a discussion with Mr. Snyder, the Owner's general superintendent. Mr. Snyder instructed the Contractor when to do the final topping and he participated in giving the directions for the final topping. The final topping was done on July 22, 1966.

Thereafter, there was a final inspection on August 5, 1966. On August 8, a final punch list was provided and on August 31, 1966, the Contractor submitted its final

bill. This final bill included $49,363.36 on the original contract and reflected the various adjustments based on differences in quantities shown in the original contract for which there was a unit price. In addition to the adjustments, $11,506.85 was added for driveways and sidewalks at unit prices agreed upon, and various invoices showing extra work of $8,458.29 were filed. The total bill was for $69,328.50, which after giving credit for $43,809.13, previously paid, left a net balance due of $25,519.37.

Mr. Myers testified that he made many attempts to see Mr. Bresler to close out the final punch list and on November 15, 1966, wrote to him to set up a meeting on November 29 to attempt to agree on methods of completing the list. No one, however, appeared at the meeting so that on December 14, Mr. Myers wrote Mr. Bresler by certified mail suggesting a meeting between December 19 and December 22, 1966. Again, he wrote Mr. Bresler on January 13, 1967, by certified mail, the receipt of which was acknowledged by Mr. Bresler, threatening to refer the matter to the Contractor's attorney.

Thereafter, counsel for the Contractor communicated with Mr. Giese, the Greenbelt City Manager, and also with the Owner. Mr. Giese, by a letter of October 26, 1967, to the Contractor, attached a copy of the punch list of August 8, 1966, and represented that this was the work which was to be completed. The Owner also replied to the letter from counsel for the Contractor but refused to deal with the Contractor directing that any arrangements be made with the City of Greenbelt. Mr. Myers was advised by counsel to complete the work and seek recovery for it later.

Mr. Myers testified that "We went back and did the punch list according to the way the engineer wanted it and had the final inspection with the engineer and he said it was okay." This was done in November 1967. A bill for the amount of $1,174.14 for this work was submitted by the Contractor to the Owner on November 30, 1967; but no money was paid, although the Contractor had an investment of money in the job for labor and ma-

terials and "had to borrow money for interest. . .to use in place of it."

Mr. Myers calculated interest on the $25,519.37 bill as follows: He began the calculation on August 31, 1966, when the Contractor had billed it after the work was done, allowed 30 days until September 30, 1966, and calculated interest at 6% per annum from that date until the time of trial, a period of approximately three years and four months or $5,103.87. On the $1,174.11 which was due on November 21, 1968, he calculated interest from that date until January 28, 1970, or shortly before the trial began on February 17, 1970, in the amount of $152.63. The total interest thus calculated was $5,256.50 which when added to the items of $25,519.37 and $1,174.-11, make a grand total of $31,949.98 claimed by the Contractor.

Mr. Hummer, the engineer representing Ben Dyer Associates, Inc., the Engineer under the contract, wrote Mr. Giese, the Greenbelt City Manager, on December 7, 1967, as follows:

> "L & S Construction Company has completed the necessary corrective work on Lakeside Drive, Maplewood, Olivewood and Pinecrest Courts, covered by Permits No. 104 and No. 105.
> "I recommend that these streets be accepted by the City of Greenbelt for maintenance. Due to the age of this work, I recommend that the one year maintenance bond be waived."

A copy of this letter was sent to the Contractor and to Mr. Bresler.

Later, on December 14, 1967, Mr. Giese, the City Manager, wrote counsel for the Contractor advising that the Engineer had recommended that the streets be accepted for maintenance but stating that acceptance "has to be done by the City Council" and the matter will be presented to the City Council at its next meeting scheduled for January 8, 1968.

The Contractor filed the action in the present case in the lower court on July 15, 1968.

Mr. Giese wrote the Owner on December 10, 1968, stating some complaints about the street; but a copy of this letter was not sent to the Contractor's counsel until April 29, 1969, claiming that a driveway entrance had been improperly located at 18 Maplewood Court and that there was a deteriorating street condition resulting from underwater drainage. Mr. Giese admitted, however, that all of the punch list made out by Mr. Hummer had been taken care of by the Contractor. Mr. Giese also admitted that the City of Greenbelt had applied for State maintenance and funds which are granted to the City by the State on a per mileage basis. In 1963, it applied for 697 feet on Maplewood Court that had been paved, 366 feet on Olivewood Court that had not been paved, and 400 feet of Lakeside Drive some of which had been paved and some not. It had received the funds in 1964. These funds did not have to be used on the streets mentioned, but could be used by the City of Greenbelt to maintain other city streets. In the year 1964, all of the streets were submitted for the State aid funds as paved streets.

Mr. Hummer, the engineer from the office of Ben Dyer Associates, Inc., the Engineer under the contract, testified that he had been employed by the Owner to do the design work and to submit the plans to Greenbelt for the Lakeside job. He then acted as engineer in charge of inspection for the City of Greenbelt. He was also responsible for visiting the site and directing the engineer who made the daily inspections. He testified that the work was done in a normal, proper manner and that the determination in regard to the time when the work was to be done was made by the Owner. The work had been done as it was ordered to be done.

Mr. Bresler testified that, in regard to the bill of July 15, 1963, for $24,913.67, the Owner had paid the Contractor $18,809.13 but for certain items, which he testified the Contractor could not substantiate, the Owner declined to pay $6,194.04. There was approximately an additional

item of $89.50 paid for in the charge for $18,809.13 as the difference between $24,913.67 and $6,194.04 is $18,-719.63 rather than $18,809.13. Mr. Bresler testified in regard to a certain other payment on account and a deposit of $8,442.57 with the title company for ultimate payment on account of the contract.

The trial judge, at the end of all of the evidence, rendered an oral opinion making certain findings of fact, hereinafter mentioned, and found a verdict for the Contractor for $31,949.98, which included interest as calculated by Mr. Myers. He found that there were many discrepancies within the printed wording of the contract which he characterized as "not only vague, it is confusing most confusing." He construed the contract against the Owner who had prepared it. He found the testimony of Mr. Myers the most enlightening testimony" to come before the trial court. On the totality of the evidence, the trial court concluded that the "contract was performed properly on behalf of the plaintiff [the Contractor, L & S] and in due time and that any delay was caused by the defendant [the Owner, Burton Builders] and there is lack of paying the money that started all this trouble. . . ." Other findings of the trial court will be considered later in this opinion.

### (1)

The Owner earnestly contends that the trial court disregarded various sections of the contract in reaching its verdict. We do not agree with this contention. The trial judge did not disregard any sections of the contract, but he did construe various sections of the contract contrary to the construction urged by the Owner. In so doing, in our opinion, he acted properly.

The Owner principally urged that under Sec. 3.03 of the Special Provisions of the contract providing in part that "all work must be prosecuted and completed to the satisfaction of the City Manager" meant, in effect, that the work must be *accepted* by the action of the City Council of Greenbelt and this was never accomplished. This,

however, is not what Sec. 3.03 provides. Sec. 3.03 does give the City Manager the right to object to the work, but there is no requirement that the City Council accept the project. By Sec. 1 (c) of the General Provisions in regard to "DEFINITIONS", it is provided that "Engineer shall mean 'City Manager—Inspection/Ben Dyer Associates, Inc. — Engineering,' or 'their' duly authorized agents." It will be recalled that the quoted words were inserted by typewriting and were properly construed to mean that the City Manager would act through the engineer. Indeed, the evidence established that the City of Greenbelt employed Ben Dyer Associates, Inc., to act in regard to the work done under the contract. Sec. 1 (e), as we have already set forth, defines the words "APPROVED, ACCEPTABLE, SATISFACTORY or words of like import" shall mean "approved by, or acceptable or satisfactory to the Engineer, unless otherwise expressly stated." Not only is there no express statement to the contrary, but the other language of the contract, when properly construed, is consistent with that definition. Mr. Hummer, the engineer who acted for Ben Dyer Associates, Inc., in this matter, testified that the Contractor had done the work in a normal manner. He indicated that the streets had been paved in 1964 and in his letter of April 3, 1968, to Mr. Giese, the City Manager, in connection with a water condition that had developed in 1968 in regard to Olivewood Court, stated in part:

> "As per your request I have inspected Olivewood Court and concur that the paving shows signs of distress. This condition is probably the result of underground water, either water main leaks or natural conditions. This paving was placed in 1964 and there were no indications of underground water at this time, and in the winter of 1968 indication of possible ground water was detected. *The contractor has performed in an acceptable manner during the original construction and through several subsequent punch lists.*

> *I feel that he is not responsible for the condition unknown to anyone until 1968."*
>
> (Emphasis supplied.)

Still later in his testimony, Mr. Hummer, after referring to the "distressed" condition of the street in 1968, stated:

> "It really should be repaired by someone. But again I point out that the—of course, you understand my personal feeling, we have inspected it and *it was agreed by the city manager as pointed out in the contract, and myself and Mr. Myers, all at one time we went around and everybody was happy with the conditions the way they were.* And then it is a matter of paperwork from then on in and it never was consummated."
>
> (Emphasis supplied.)

Mr. Hummer also testified that it was his feeling that "the streets were accepted by Mr. Giese. . . ."

There was sufficient evidence to support the trial court's conclusion that the work had been accepted by the City Manager both acting through the engineer and personally.

The Owner correctly cites *Ferris v. Polansky,* 191 Md. 79, 84, 85, 59 A. 2d 749, 752 (1948) for the proposition that when parties to a valid contract refer any question of performance to the decision of one of them or to a third party, the decision of such a party is final in the absence of fraud or bad faith, as well as *Hughes v. Model Stoker Co.,* 124 Md. 283, 92 A. 845 (1914) and *J. A. La Porte Corporation v. Mayor and City Council of Baltimore,* 13 F. Supp. 795 (D. Md. 1936) to the same general effect. As the Owner states, there is no suggestion that the Engineer or the City Manager acted by fraud or in bad faith; but the rule is not applicable in the present case because both the Engineer and the City Manager *did approve of the work.*

## (2)

The Owner next contends that the trial court's verdict was contrary to the evidence. We do not find it to be so and, in any event, it is not clearly in error. Maryland Rule 886.

The Owner specifically complains of the following statement of the trial court in its oral opinion:

> "Mr. Bresler states that certain work was not acceptable. Well, by whom is it not acceptable? The engineer said it was acceptable, the manager of the city said it was acceptable. If it is not acceptable by you, you are not the one to lay down the standards of acceptability even in accordance with the contract. You say certain jobs were rejected. Well, what right did you have to reject a job that the engineer said was necessary in order to accomplish the job? The Court fails to find that you had any justification whatsoever for rejecting any of the jobs that were done that the engineer required to be done."

We have already indicated that the trial court's construction of the contract was correct and have referred as well to various portions of the evidence which support the trial court's statement.

In addition, the City Manager testified that as a result of the inspection of the work by Mr. Hummer and the City Manager, Mr. Giese, a punch list was made and that "eventually all the items on the punch list were remedied, yes."

The evidence is also clear that the driveways were positioned by the Owner's superintendent on the ground, as Mr. Hummer testified; and the Owner, who is building the houses, "knows where the driveways should go, lines up the driveway with the house under construction and says 'Put the driveway here' to" the Contractor's employees.

The Owner also challenges the trial court's statement and finding that the contract was properly performed by

the Contractor and in due time, any delay being caused by the Owner. The trial court also indicated that the Contractor could not go forward with the paving and other work on the streets. As we have observed, however, the contract, itself, provides in ink, in the Proposal sheets, which are part of the contract, under the statement that the "contract will be completed within Sixty days (60) Calendar Days," the words "Quotation as directed"; and the Proposal sheet also provides that the contract time is applicable to Section One only, Sections Two and Three "to be completed within a reasonable time when notified." The testimony we have already set forth earlier in this opinion, supports the trial court's finding of timely performance as well as of proper performance by the Contractor.

### (3)

The Owner next argues that the verdict was excessive and improper. We do not agree with this argument.

The Owner relies on Sec. 37 "EXTRA WORK" of the General Provisions and particularly objects to the allowance by the trial court of $21,139.25 for extra work because, it asserts, there was no written order of the Engineer for the extra work and no certification by the Engineer to the Owner for payment of the bills for extra work. It relies upon the decisions of this Court in *Rea Construction Co. v. State Roads Commission*, 226 Md. 569, 174 A. 2d 577 (1961); *Filston Farm Co. v. Henderson*, 106 Md. 335, 67 A. 228 (1907); *O'Brien v. Fowler*, 67 Md. 561, 11 A. 174 (1887); and *Abbott v. Gatch*, 13 Md. 314 (1859) to support its contention that the absence of a written order or certification by the engineer under a contract provisions requiring such an order or certificate is a condition precedent to recovery by the contractor for such extra work. This is the general rule in the absence of fraud or bad faith on the part of the owner *or* unless the requirement of *the written order or certificate is waived*.

In the present case, in our opinion, there was evidence from which the trial court could conclude—as it did—

that the requirement of a written order or certification for the extra work had been waived, thus distinguishing the cases relied on by the Owner from the present case.

In *Freeman v. Stanbern Const. Co.*, 205 Md. 71, 79, 81, 106 A. 2d 50, 55 (1954), in holding that there was sufficient evidence which should have been admitted by the lower court in that case for consideration by the jury, of a subsequent oral contract for certain landscaping work in the face of a provision in the written contract that deviations from the plans and specifications should not be allowed except by an agreement in writing, Judge Delaplaine, for the Court, stated:

> "We hold that a subsequent oral modification of a written contract may be established by a preponderance of the evidence. *Achenbach v. Stoddard*, 253 Pa. 338, 98 A. 604; *United Steel Co. v. Casey*, 6 Cir., 262 F. 889, 891. Of course, if the written contract provides that it shall not be varied except by an agreement in writing, it must appear that the parties understood that this clause was waived. However, such a clause may be waived by implication as well as by express agreement. This rule was adopted in *Bartlett v. Stanchfield*, 148 Mass. 394, 19 N. E. 549, 550, where a contract for the building of a house stipulated that no charge should be made for extra work or materials unless the same should be ordered in writing and the price thereof agreed upon. The plaintiff offered to show that he had performed work independent of the contract. The defendant objected to such testimony on the ground that the work and materials were not ordered in writing and that no price was agreed upon. The jury apparently found that the terms of the contract had been waived and that there had been a new oral agreement. It was argued on appeal before the Supreme Judicial Court of Massachusetts that there was no evidence of a

waiver of the stipulation in the contract, but that Court held that the testimony that the owner had orally requested the contractor to perform extra work and had promised to pay for it and had also requested him to furnish extra materials was sufficient to justify the submission to the jury of the question of a waiver.

"In support of that ruling, Justice Holmes, speaking for the Court, commented as follows: 'The main argument for the defendant is that, if the work fell within the provisions of the contract, there was no evidence of a waiver. We are of opinion that there was evidence for the jury. Attempts of parties to tie up by contract their freedom of dealing with each other are futile. The contract is a fact to be taken into account in interpreting the subsequent conduct of the plaintiff and defendant, no doubt. But it cannot be assumed, as matter of law, that the contract governed all that was done until it was renounced in so many words, because the parties had a right to renounce it in any way, and by any mode of expression, they saw fit. They could substitute a new oral contract by conduct and intimation, as well as by express words.

" 'In deciding whether they had waived the terms of the written contract, the jury had a right to assume that both parties remembered it, and knew its legal meaning. On that assumption, the question of waiver was a question as to what the plaintiff fairly might have understood to be the meaning of the defendant's conduct. If the plaintiff had a right to understand that the defendant expressed a consent to be liable, irrespective of the written contract, and furnished the work and materials on that understanding, the defendant is bound.' "

This Court then distinguished the prior case of *Abbott v. Gatch, supra,* relied on by the Owner.

It is apparent that the case of *Bartlett v. Stanchfield,* 148 Mass. 394, 19 N. E. 549 (1889) relied on and followed by us in *Freeman* is closely in point with the instant case.

The holding in *Freeman* is in accord with the general law. 17A C.J.S. *Contracts* § 377 c (1963) ; 12 Am. Jur. *Contracts* § 428 p. 1006 ; 66 A.L.R. 649, 662 ; 6 *Corbin on Contracts* § 1294 (1962) ; 4 *Williston on Contracts* § 591 (3rd ed. 1961).

See *Arc & Gas Welder Assoc., Inc. v. Green Fuel Economizer Co.,* 285 F. 2d 863, 869 (1960—CA 4), citing the *Freeman* case.

There was evidence in the present case which would support the trial court's finding that the Owner's General Superintendent on the job, Mr. Snyder, had authorized the extra work to be done and that this work was accepted and used. Mr. Snyder was not produced as a witness to contradict this evidence, which then stood as uncontradicted. It can hardly be said, under these circumstances, that the trial court was clearly in error in this finding.

The Owner also contends that, in any event, the trial court should not have allowed interest on the total of $21,-139.25 for extra work in view of the provisions in Sec. 37 (e) of the General Provisions that the Contractor should "not be entitled to any claim on any bill for extra work on account of delay in its approval." The Owner claims that such bills were never approved and hence no interest should be allowed on the claims for extra work. This contention, it seems to us, assumes that the extra work had not been approved, whereas the trial court, upon sufficient evidence, found that it had been approved. Mr. Myers calculated the interest beginning 30 days after the submission of the Contractor's bill for $25,519.37 (including the approved extra work except for $1,174.11) of August 31, 1966, and on the $1,174.11 of extra work due November 21, 1967, as already set forth. It is our opinion that in view of the entire testimony and particularly of Mr. Myers' testimony that the Contractor had an investment in the job for labor and materials and "had

to borrow money for interest. . .to use in place of it," there was no abuse of discretion in the allowance of interest by the trier of fact. See *Brown v. Bradshaw*, 245 Md. 524, 539, 540, 226 A. 2d 565, 573 (1967), and cases therein cited.

### (4)

Finally, the Owner contends that the trial court erred in dismissing its counterclaim against the Contractor for $35,350.00 representing "liquidated damages" for 1010 days the Contractor was allegedly in default pursuant to Sec. 3.17 of the Special Provisions, already set forth in this opinion.

The Owner relies on a letter of May 15, 1969, signed on behalf of Ben Dyer Associates, Inc. by one Leslie A. Smith, as Vice President. This letter is based on the premise that "acceptance" by the City of Greenbelt is required (as contrasted with completion to the satisfaction of the City Manager) and states that "using the date of August 8, 1966 as the completion date, we find the contractor is in default in the amount of 1,010 calendar days." Reliance on this letter is misplaced for two reasons: (1) Mr. Smith was not produced to identify his signature and the letter and to subject himself to cross-examination in regard to its contents, so that the trial court—no proper foundation having been laid for its admission into evidence—properly, we think, refused to admit the letter into evidence and thus it is not before us in the present case, cf. *LeBrun v. LeBrun*, 55 Md. 496, 508 (1881), *McCormick on Evidence* § 185; and (2) the trial court, upon sufficient evidence, had found that the work had been timely done under a proper construction of the contract and the applicable facts as found by the trial court, so that the premise upon which the letter is based in its calculation of days was no longer viable in the instant case. We find no error in the dismissal of the Owner's counterclaim by the trial court.

In summary, it should be observed that the trial court properly construed the contract taken as a whole and reconciled all of the provisions of the contract in the light

of the intention of the parties. Substantially all of the basic issues were issues of fact, found against the Owner and in favor of the Contractor on substantial evidence. In our opinion, the findings of fact of the trial court were not clearly erroneous and its legal conclusions were not in error.

*Judgment affirmed, the appellants to pay the costs.*