LAK, INCORPORATED, Plaintiff–
Third/Party–Defendant–
Appellant,

v.

DEER CREEK ENTERPRISES,
Defendant–Third/Party–
Plaintiff–Appellee,

and

Backer & Backer, P.C., Defendant–
Appellee.

LAK, INCORPORATED, Plaintiff–
Third/Party–Defendant–
Appellee,

and

Beznos Realty Investment Company,
Third/Party–Defendant–
Appellee,

v.

DEER CREEK ENTERPRISES,
Defendant–Third/Party–
Plaintiff–Appellant.

Nos. 91–1791, 91–1911.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 11, 1992.

Decided Sept. 24, 1992.

As Amended Oct. 13, 1992.

Richard L. Darst (argued), Robert A. Garelick, Thomas C. Kus, Mantel, Cohen, Garelick, Reiswerg & Fishman, Indianapolis, Ind., for LAK, Inc., plaintiff-appellant.

Jeffrey G. Heuer (argued), Brian G. Shannon, Jeffrey G. Raphelson, Jaffe, Sni-

der, Raitt & Heuer, Detroit, Mich., Marvin Mitchell, Olivia Napariu, Mitchell, Hurst, Jacobs & Dick, Indianapolis, Ind., for Deer Creek Enterprises, defendant-appellee.

David J. Backer, Backer & Backer, Indianapolis, Ind., for Backer & Backer, P.C., defendant-appellee.

Kenneth J. Clarkson, D. Michael Kratchman, Michael J. Mehr, Evans & Luptak, Detroit, Mich., for Beznos Realty, defendant-appellee.

Before CUMMINGS, Circuit Judge, and WOOD, Jr., and ESCHBACH, Senior Circuit Judges.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

On March 2, 1984, Beznos Realty Investment Co. ("Beznos Realty") and Deer Creek Enterprises ("DCE") formed a contract:[1] Beznos Realty agreed to purchase and DCE agreed to sell a 45–acre, mostly undeveloped tract between Ft. Lauderdale, Florida, and Boca Raton for $5,501,562.00. Beznos Realty put down $275,078.10 in earnest money. Closing was to be sixty days after contract formation, but the purchaser could receive a 30–day extension if it encountered a delay in financing. Moreover, if Beznos Realty had not received a financing commitment from Metropolitan Life Insurance Co. within thirty days, the contract automatically terminated and DCE would return the earnest money plus accrued interest. The 45–acre tract, known as the Cypress Parcel, had an 8–unit apartment on it, and Beznos envisioned constructing an additional 532 units, a number it claims was necessary if it were to achieve the benefit of its bargain with DCE. Needless to say, a dispute arose about performance; the parties never closed; and this suit commenced.

The parties dispute the meaning of the contract and, consequently, their obligations with respect to the land use controls that regulated development of the Cypress Parcel, which is located in the Deer Creek development, City of Deerfield Beach, Broward County, Florida. The contract provided, "532 units shall be available to the property in accordance with an appropriate site plan." Whether 532 units or, as Beznos Realty seems to have wanted, 532 *additional* units would be available depended on the laws and regulations governing development of the tract.

At least three sets of land use controls were in place. There is no argument about one: zoning. The Cypress Parcel was zoned to permit 678 units, more than enough to accomplish Beznos Realty's planned development. The second control instrument was the Deer Creek Master Land Use Plan, or Master Site Plan, that included height, setback, design, and unit-concentration limitations. It permitted 4,000 units in Deer Creek for an average density of 7.4 units per acre; locally, there could be up to fifteen units per acre. Because large expanses of Deer Creek contained lakes, golf courses, and similar, not-built-on acreage, the Cypress Parcel could accommodate at least 540 units: the eight already present plus the 532 Beznos Realty wanted to add. The third control instrument, the Lakes of Deer Creek Plat, or Master Plat, limited the number of units that could be built in the Lakes of Deer Creek, which is the western part of Deer Creek, and includes the area where the Cypress Parcel is situated. It was this instrument, along with the parties' failure to communicate, that spelled the demise of the contract.

Until February 27, 1984, two days before Beznos Realty signed the contract, the Master Plat limited Lakes of Deer Creek to a total of 989 units. Because 748 units had been allocated to other tracts, there could be no more than 241 units on the Cypress Parcel. Amending the Master Plat required approval by both the Deerfield Beach City Commission and the Broward County Planning Commission. On February 27th the City approved DCE's request to amend the Master Plat to accommodate

---

1. Beznos Realty signed the contract on February 29, and DCE signed on March 2. Because the contract specifies the date of the last party's execution of the contract is the effective date of the contract, we use March 2nd as the date of contract formation, a point not in dispute.

a total of 508 units on the Cypress Parcel. This amendment was a long but incomplete step toward approving the 532 additional units Beznos Realty wanted; thirty-two more units needed to be approved and Broward County needed to act. Nonetheless, on April 10, 1984, Beznos Realty presented a site plan for constructing 532 units on the Cypress Parcel to the City Planner of Deerfield Beach. The City Planner straightaway rejected the site plan because, in calling for construction of 532 additional units, it exceeded the 508–unit cap already in place.

Meanwhile, Beznos Realty had not received a loan commitment from Metropolitan Life by April 1st, and the contract terminated automatically. The parties, however, acted as though it could be resuscitated, and on May 5th the contract was revived when DCE, at the request of Beznos Realty, waived the automatic termination. Four days earlier on May 1st DCE, represented by its attorneys, Backer & Backer, had written Beznos Realty "insisting" on closing on the property "as is," stating it would not "reduce the purchase price due to the Purchaser's inability to receive approval to construct 532 units," and offering Beznos Realty the option of not closing or waiving approval of the site plan and proceeding to closing. On May 8th Beznos Realty assigned all its rights and interests in the contract to LAK, Inc., a Michigan corporation, and on May 16th, two weeks before the scheduled closing, LAK filed a diversity suit against DCE and its attorneys in the United States District Court for the Eastern District of Michigan, claiming, *inter alia*, that the May 1st letter constituted breach of contract by anticipatory repudiation.

LAK sought payment of accrued interest on the earnest money and either specific performance or abatement in the sale's price. LAK won, but the Court of Appeals for the Sixth Circuit reversed and remanded with instructions to dismiss for lack of personal jurisdiction. *Lak, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293 (6th Cir. 1989), *cert. denied*, 494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990). The Michigan long-arm statute did not reach either DCE or its attorneys: they were citizens and residents of Indiana and had not availed themselves of Michigan law. LAK refiled in the United States District Court for the Southern District of Indiana but lost this time around. The court first found that, although Florida's substantive law applied, the parties were bound by Indiana's statute of limitations, which, unlike Florida's, did not bar the suit. Then, relying in large measure, as the parties had requested, on the record from the Michigan trial court, Judge Dillin granted DCE's motion for summary judgment and denied LAK's motion for partial summary judgment. LAK appeals, and DCE cross-appeals the finding that Indiana's statute of limitations controls. For the reasons stated below we affirm the court's grant of summary judgment in favor of DCE and dismiss DCE's appeal as moot.

## ANALYSIS

LAK, Inc., the plaintiff-appellant and a third party defendant-appellee, is a Michigan corporation with its principal place of business in Michigan, and Beznos Realty Investment Co., also a third party defendant-appellee, is a Michigan partnership with its principal place of business in Michigan. Deer Creek Enterprises, the defendant-appellee and third party plaintiff-appellant, is an Indiana general partnership with its principal place of business in Indiana, and Backer & Backer, P.C., a defendant-appellee, is an Indiana corporation with its principal place of business in Indiana. The amount in controversy exceeds $50,000. Thus, there is diversity jurisdiction. 28 U.S.C. § 1332. The district court entered final judgment for DCE on March 8, 1991, and LAK timely filed its notice of appeal; thus, we have jurisdiction. 28 U.S.C. § 1291. Deer Creek Enterprises filed a timely notice of cross-appeal. That appeal is made moot by our decision and is, accordingly, dismissed.

We review a district court's grant of summary judgment *de novo*, viewing the facts in a light most favorable to the non-moving party. *Prince v. Zazove*, 959 F.2d 1395, 1398 (7th Cir.1992); *Ooley v. Schwit-*

*zer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1297 (7th Cir.1992). "The movant has the burden of showing that there is no genuine issue of fact, but ... [under Fed. R.Civ.P. 56(e) the non-moving party] must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). "[T]here can be 'no genuine issue as to any material fact'" where a party who bears the burden of proof fails to establish an essential element in its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). .

■■■ LAK argues the trial court erred because, having found disputed parts of the contract ambiguous, it should have denied DCE's motion for summary judgment and proceeded to trial so the factfinder could determine the meaning of the contract and whether DCE breached it. That might be appropriate where a party alleges breach by nonperformance, but this is a suit for breach by anticipatory repudiation. Consequently, the plaintiff bears a greater burden. "Because the doctrine of anticipatory repudiation represents a harsh remedy, the requirement that the repudiating statement be clear and absolute is a strict one." *Commonwealth Edison Co. v. Decker Coal Co.*, 612 F.Supp. 978, 981 (N.D.Ill.1985) (citations omitted). As we shall see, the mere existence of a contract ambiguity and a plaintiff's allegation of anticipatory repudiation do not, *a priori*, preclude granting a defendant's motion for summary judgment in a suit for breach by anticipatory repudiation.

The contract at issue here expressly identifies Florida law as the governing law. While we are not bound by the parties' choice of law, no party has challenged the application of Florida's substantive law. Thus, we proceed accordingly.

■■■ Florida law on breach of contract by anticipatory repudiation is long-standing and clear:

a mere statement by a vendor before the date fixed in the contract for him to perform that he does not intend to carry out his agreement does not give the vendee an immediate cause of action ... unless the anticipatory breach is accompanied by some fact which shows a direct, unequivocal, and absolute purpose to breach the contract amounting in substance to an actual breach.

*Slaughter v. Barnett*, 114 Fla. 352, 154 So. 134, 138–39 (1934). "A prospective breach of the contract occurs when there is absolute repudiation ... but the refusal [to perform] must be distinct, unequivocal, and absolute." *Mori v. Matsushita Elec. Corp.*, 380 So.2d 461, 463 (Fla.Dist.Ct.App. 1980). LAK argues that DCE's letter of May 1, 1984, constitutes breach by anticipatory repudiation, that it was an absolute repudiation, a distinct, unequivocal refusal to perform. DCE responds that there was no distinct, unequivocal refusal to perform, no absolute repudiation; rather, it was merely asserting its right to perform according to its interpretation of the contract, and, therefore, there was no breach by anticipatory repudiation.

DCE's statement of law, if not its application, is correct. We have followed the "unexceptionable" principle of law "that it is not a breach of contract to refuse to accept the other party's interpretation of the contract...." *American Hosp. Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 600 (7th Cir.1986) (affirmed district court's finding that "American Hospital Supply's refusal to accede to Hospital Product's unilateral understanding was not a repudiation of the contract"). The principle was well stated some four decades ago by Corbin:

Where the two contracting parties differ as to the interpretation of the contract or as to its legal effects, an offer to perform in accordance with his own interpretation made by one of the parties is not in itself an anticipatory breach. In order to constitute such a breach, the offer must be accompanied by a clear manifestation of intent not to perform in accordance with any other interpretation.

4 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 973 at 911 (1951). Here, the district court found that DCE's letter of May 1 was an insistence on performance consistent with either of two readings of the contract put forth by DCE, that the contract was ambiguous on the points in dispute, and that DCE's readings were plausible. Thus, the court concluded DCE did not breach by anticipatory repudiation, granted summary judgment in favor of DCE, and denied LAK's motion for partial summary judgment.

The body of the May 1st letter, sent by DCE's attorney to the attorneys for Beznos Realty, states in its entirety,

> I am in receipt of your letter dated April 27, 1984 concerning the extension of the closing of the purchase of the Cypress Parcel at Deer Creek pursuant ot [*sic*] paragraph 14 of the Purchase Agreement. As you are aware, last week I met with Mr. Al Beckey concerning the City of Deerfield's position relative to the amendment of the existing plat to permit the construction of approximately 509 dwelling units on the Cypress Parcel.
>
> Without arguing the meaning of the representations and warranties contained in paragraph 8, subsection (g), (k)(i) and (k)(ii), it is our position that the property must be accepted by the purchasers "as is". The Hastens will not reduce the purchase price due to the Purchaser's inability to receive approval to construct 532 units on the Cypress Parcel. In light of the reduced density, would you please advise me immediately if Beznos Realty Investment Company is not willing to close the purchase of the Cypress Parcel. Otherwise, we shall assume Beznos Realty has waived the requirement that it receive site plan approval for the construction of the 532 units and will proceed to closing.

> May I hear from you at your earliest convenience. Thank you for your cooperation.

The allegedly repudiating phrase, "as is," meant on May 1, 1984, that, *inter alia*, (a) the Cypress Parcel was zoned to permit a total of 678 units, (b) the Deer Creek Master Land Use Plan, or Master Site Plan, permitted 540 units on the Cypress Parcel, and (c) the Lakes of Deer Creek Plat, or Master Plat, as amended February 27, 1984, permitted 508 units on the parcel.[2] Recall that twenty-one days earlier on April 10, 1984, Deerfield Beach's Director of City Planning had rejected Beznos Realty's site plan for 532 new units because it exceeded the total of 508 units then permitted by the Master Plat. Recall, too, that the would-be purchaser, Beznos Realty, had concluded it needed to construct 532 new units on the Cypress Parcel to accommodate the sale price; thus, after the rejection of its site plan on April 10, it had sought a pro rata, price reduction from DCE. To determine if DCE's May 1st letter, insisting on purchase "as is" without an adjustment in price, was an anticipatory repudiation, we must look to the disputed portion of the contract and determine if DCE was offering to perform in accordance with its own interpretation and if, as Judge Dillin stated, that interpretation was plausible.

In relevant parts, Section 8 of the contract, formed March 2, 1984, states:[3]

> Seller hereby represents, covenants and warrants to Purchaser as follows:
>
> . . . .
>
> (g) That the Property is currently zoned to permit the construction of 532 units, and 532 units shall be available to the property in accordance with an appropriate site plan, as long as Purchaser complies with all appropriate laws and regulations governing the development of the Property.
>
> . . . .

---

**2.** Whether "as is" would have the same meaning at closing, some thirty days later, depended on events not entirely within the parties' control.

**3.** Rather than attempt to reproduce the form of the contract with respect to initialed insertions and deletions, we present the contract as it would appear had it been redrafted, incorporating the textual changes.

(k) That all Broward County and City of Deerfield Beach impact fees have been paid based upon the equivalent of 532 residential units as of the Closing, and Purchaser's use of the Property (construction of a maximum of 532 multifamily dwelling units) will not result in an assessment of additional impact fees against Purchaser.

(k)(i) The Deer Creek Improvement Association shall approve a site plan for 532 units on the property.

(k)(ii) That the City of Deerfield Beach shall approve a site plan consistent with its laws and regulations for 532 units.

. . . .

The representations, warranties, and covenants of the Seller contained herein shall be true and correct as of the Closing and shall survive the Closing for a period of one (1) year with the exception of subsection 8(a) which shall survive the Closing without a time limitation.

Three conclusions flow directly from a plain reading of both the contract and the May 1st letter and from the actions of the parties. First, Section 8 of the contract is facially ambiguous on the points at issue, and DCE's interpretations are reasonable, or, as Judge Dillin stated, "plausible." Second, DCE was lawfully refusing to accede to Beznos Realty's understanding of the contract and was lawfully offering to perform according to its own, reasonable interpretation. Third, the letter of May 1 did not manifest a direct, unequivocal, absolute refusal to perform. Rather, the letter, although refusing to lower the contracted-for price of the Cypress Parcel, did offer Beznos Realty an alternative: (1) do not close or (2) waive approval of a site plan for constructing 532 units and proceed to closing.

Section 8 of the contract is ambiguous in several respects. There is no problem, however, with the first part of Subsection

g: at the time of contract formation the property was zoned to permit construction of at least 532 units. It would remain so through closing and for the warranted succeeding year unless the Deerfield Beach City Commission, a unit of government over which neither party had control or authority, independently acted to change the zoning.

There are numerous interpretative problems, though, with the next part of Subsection g. It states that "532 units shall be available," but the purchaser, knowing the property already had eight units on it, wanted 532 *new* units to be available. This clause, written and inserted by Beznos Realty, clearly does not comport with what LAK now asserts it intended. The clause also states the units shall be available "in accordance with an appropriate site plan." It is undisputed, however, that the Master Site *Plan* permitted 540 units on the Cypress Parcel—meaning, of course, 532 new units could be added.[4] It was the Master *Plat* that, at the time, limited construction to not more than 500 new units and that was the basis for the City Planner's rejecting Beznos Realty's proposed site plan. Even were it DCE's contractual obligation to secure approval of a 532–unit site plan, whatever that envisioned, it could still have been Beznos Realty's contractual obligation to secure the prerequisite changes in the Master Plat. This conclusion can reasonably be drawn from Subsection g's requirement that the "Purchaser compl[y] with all appropriate laws and regulations governing the development of the Property." Surely, the Master Plat was a law or regulation governing development of the property; whether "all" meant "all," not just height, set-back, and other construction requirements, as LAK argues, is a point the parties dispute. It is reasonable to interpret the contract as requiring Beznos Realty to secure the needed amendment to the Master Plat.[5]

---

4. One might be tempted to construct an argument that DCE had met its contractual obligation: 532 units were available to the property in accordance with an appropriate site plan, the Master Site Plan. What was needed but missing, though, was an approved, locale- or site-

specific site plan for the Cypress Parcel. It is not altogether clear from the language of Subsection g which "plan" the parties intended.

5. We do not state this is the only reasonable interpretation, rather, that it is a reasonable one. LAK might well consider the need to com-

Verb tense also raises an ambiguity. Subsection g states, "the property is currently zoned...." No problem here; it was so zoned at the time. The subsection also states, using the future tense, however, "532 units shall be available...." When shall they be available? They were not on May 1. Were they supposed to have been available by the scheduled closing, some thirty days later? We cannot know from the language of the contract and shall never know if they would have been. Alternatively, as DCE argues, since the purchaser could have started construction of the 500 units permitted by the Master Plat upon closing, would it not suffice if the additional units became available sometime within the one year of extended warranty after closing? We cannot tell from the contract, and we shall never know, either. We do know that DCE responded affirmatively to the order for specific performance issued by the District Court for the Eastern District of Michigan and secured approval for the requisite unit increase from the City of Deerfield Beach in January 1987 and from the Broward County Planning Commission on April 21, 1987.

Furthermore, we note Beznos Realty attempted to perform what in this suit LAK claims was DCE's contractual obligation. That is, Beznos Realty presented a site plan to the City Planner for 532 new units on the Cypress Parcel. If securing site-plan approval was so unambiguously the seller's duty, then why did the purchaser make the attempt? We think it is because the locus of the duty was ambiguous.

█ Lastly, the alleged contractual obligations placed on the seller by Subsections (k)(i) and (k)(ii) are unenforceable. Both the Deer Creek Improvement Association and the City of Deerfield Beach are independent, third parties. They are neither signatories to nor, apparently, intended beneficiaries of the contract. Their action to either approve or disapprove a site plan cannot be mandated by the contract between Beznos Realty and DCE. Thus, neither Subsection (k)(i) nor (k)(ii) can mean

what it says on its face. We think but do not hold that they read more like independent conditions, the failure of which places no liability on DCE but releases the purchaser from further performance.

We, therefore, hold it was reasonable for DCE to consider it was the purchaser's duty to comply with literally "all appropriate laws and regulations governing the development of the Property" and, accordingly, to secure the necessary amendment to the Master Plat so that a specific site-plan, calling for 532 units, possibly for 532 new units, could—not necessarily would—be approved by the City Planner and ultimately by all necessary governmental bodies. We also hold it was reasonable for DCE to consider that, if it had the duty to secure approval of a 532–unit, or 532–new–unit, site plan for the Cypress Parcel, it had at least until closing and, quite possibly, until one year after closing to do so.

Having found that DCE was asserting its own, reasonable interpretation of the contract, we are driven to the conclusion that, absent clear indicia to the contrary, DCE was lawfully offering performance in compliance therewith and lawfully refusing to accede to Beznos Realty's, now LAK's, understanding of the contract. In the first paragraph of the May 1st letter, DCE's attorney acknowledges having met with "Al Beckey" (We do not know, but this could be a reference to Albert S. Beke of Beznos Realty) about the City's position on amending the existing *plat.* Conceivably then, the problem with securing approval to construct new units on the Cypress Parcel had been identified as the Master Plat, not the Master Site Plan, and, thus, was arguably Beznos Realty's to solve.

The next paragraph acknowledges the existence of an argument about the meaning of paragraph (what we have denominated Section) 8, Subsections (g), (k)(i), and (k)(ii) and states that, notwithstanding the argument, "it is our position that the property must be accepted by the purchasers 'as is'." The letter states a position, a position based on DCE's interpretation of the contract, an interpretation we have

---

ply with the Master Plat and, thus, to secure the Plat's amendment are underlying obligations

that constitute part of the seller's alleged duty to secure approval of a 532–unit site plan.

found reasonable; concomitantly, the letter seemingly rejects the position put forth by Beznos Realty, a position based on its own interpretation of the contract. Stating a position based on a reasonable interpretation of the contract and refusing to accede to the other party's, as DCE did, does not, without more, amount to a "clear manifestation of intent not to perform in accordance with any other interpretation." That "more," that "clear manifestation of an intent not to perform," is not in the May 1st letter. Rather, the letter extends an offer to Beznos Realty to either not close or waive the "requirement that it receive site plan approval for the construction of 532 units and ... proceed to closing." Additionally, by its substance, although not on its face, the letter extends an offer to negotiate further.

Accordingly, we find DCE was lawfully offering to perform in compliance with its own, reasonable interpretation of the contract and was lawfully refusing to accept Beznos Realty's interpretation.

Notwithstanding our findings above, we also find no direct, absolute repudiation of the contract, no distinct, unequivocal and absolute refusal to perform the contract. The letter of May 1st does not refuse Beznos Realty's request to defer closing; it acknowledges the request but does not otherwise respond, affirmatively or negatively. The letter acknowledges the dispute over interpretation of certain portions of the contract and states DCE's position: (1) it "will not reduce the purchase price due to Purchaser's inability to receive approval to construct 532 units on the Cypress Parcel" [6] and (2) the purchaser must accept the property " 'as is'." But even here, DCE left the door to the negotiating parlor open; it offered the purchaser the option of not closing or waiving the site-plan requirement. Because DCE did not also request a waiver of the accompanying, 1–year extension of representations, warranties, and

covenants, the offered waiver would, conceivably, extend only to the perceived requirement that the Cypress Parcel site-plan be approved by the time of closing. Thus, the parties still could have agreed it was DCE's duty to secure approval of a 532–new-unit, Cypress Parcel site-plan within the year after closing.[7] DCE might well have been able to perform accordingly, or it might not. We shall never know because of the nature of LAK's peremptory strike on May 16th.

## CONCLUSION

For the reasons stated above the judgment and order of the district court is

AFFIRMED AND THE CROSS-APPEAL DISMISSED.

---

**6.** Part of the problem too, at least from DCE's viewpoint, would be the seeming inequity of DCE's selling to Beznos Realty at a reduced price only to see the purchaser then secure the desired development approvals within the succeeding year and be proportionally and, possibly, unjustly enriched.

**7.** One argument DCE has made for its having not breached the contract by anticipatory repudiation is that the contract, if it required DCE to secure the disputed site-plan approval, only required DCE to do so within the year after closing, not by closing.