Filed:  April 12, 2005

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 04-1391
(CA-01-254-AW)

BI-TECH NORTH, INCORPORATED, a New Hampshire
Corporation,

                                   Plaintiff - Appellant,

        and

WILLIAM SHERLOCK; BI-TECH, INCORPORATED, a
New Jersey Corporation,

                                   Plaintiffs,

        versus

LOCKHEED   MARTIN   CORPORATION,   a   Maryland
Corporation   acting   through   its   Sanders
Business Unit,

                                   Defendant - Appellee.

O R D E R

        The court amends its opinion filed March 10, 2005, as follows:

        On the cover sheet, section 8, line 5 -- the names of Juanita

A. Crowley, Paul R. Q. Wolfson, Edward N. Siskel, WILMER, CUTLER,

PICKERING, HALE AND DORR, L.L.P., Washington, D.C., are added as

counsel for Appellee.

                                   For the Court - By Direction

                                   /s/ Patricia S. Connor
                                            Clerk

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-1391**

---

BI-TECH NORTH, INCORPORATED, a New Hampshire
Corporation,

Plaintiff - Appellant,

and

WILLIAM SHERLOCK; BI-TECH, INCORPORATED, a
New Jersey Corporation,

Plaintiffs,

versus

LOCKHEED MARTIN CORPORATION, a Maryland
Corporation acting through its Sanders
Business Unit,

Defendant - Appellee.

---

Appeal from the United States District Court for the District of
Maryland, at Greenbelt. Alexander Williams, Jr., District Judge.
(CA-01-254-AW)

---

Argued: November 30, 2004          Decided: March 10, 2005

---

Before WIDENER, MICHAEL, and MOTZ, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Peter David Goldberger, Ardmore, Pennsylvania, for
Appellant. Francis Joseph Gorman, GORMAN & WILLIAMS, Baltimore,
Maryland, for Appellee. **ON BRIEF:** Neil E. Jokelson, David
Jokelson, Derek Jokelson, NEIL E. JOKELSON & ASSOCIATES,
Philadelphia, Pennsylvania, for Appellant. Juanita A. Crowley,

Paul R. Q. Wolfson, Edward N. Siskel, WILMER, CUTLER, PICKERING, HALE AND DORR, L.L.P., Washington, D.C. for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

PER CURIAM

In this diversity contract and tort action, we affirm the district court's grant of summary judgment to Lockheed Martin Corp. and denial of partial summary judgment to Bi-Tech North, Inc. ("BTN").

## I.

In March 1998, William Sherlock, the principal in Bi-Tech, Inc. ("BTI"), a machine shop, began negotiations with a unit of Lockheed to buy from Lockheed the Manchester Machine Center ("MMC").

In late December 1999 and early January 2000, the parties executed documents that provided, inter alia, that BTN, a New Hampshire corporation created for the purpose of the purchase, would buy MMC from Lockheed for $500,000--a $100,000 down payment, with the remaining $400,000 to be paid in equal monthly installments for one year, pursuant to the terms of a promissory note (the "Note"). BTN would pay $310,000 to lease the building housing MMC for one year, with options to renew at a lower rate or to purchase for $2.1 million. BTN would continue to employ designated MMC employees at (at least) the same pay and with (at least) the same benefits. Also, Lockheed would have a priority security interest in the assets transferred to BTN, which BTN could not further encumber; and BTI would guarantee BTN's payment of the

3

Note and performance of all obligations under the agreement. While the agreement became effective December 23, 1999, the deal was not to close until January 3, 2000.

A few provisions of the agreement are important here:

1. Article IX lists "Conditions to Closing." Section 9.03(a) conditions Lockheed's obligations on BTI's and BTN's performance of its obligations under the agreement and conditioned Lockheed's performance on the truth and correctness (in all material respects) of BTI's and BTN's representations and warranties contained in the transaction documents. Section 9.03(c)(iii) conditions Lockheed's obligations on BTN having provided to Lockheed "reasonable assurances" that BTN had in place "sufficient financial resources to satisfy the Promissory Note and to satisfy and perform its other obligations under the Transaction Documents."

2. Article IV lists the "Representations and Warranties" of BTN and BTI. Section 4.01(e) represents and warrants that each was "capable of performing, in all material respects, each agreement, covenant and obligation required by the Transaction Documents" and that at the time of the transactions, BTN would have "the resources and assets necessary and sufficient to conduct the [business of MMC] and to perform its obligations and Contracts that constitute Transferred Assets." Section

4

4.01(h) represents and warrants that BTN had "available to it cash, marketable securities or other investments, or presently available sources of credit, to enable it to consummate the Contemplated Transactions and to pay the Purchase Price."

3. Article XI governs termination. Section 11.01(b) controls termination if the deal has not closed by January 15, 2000, and allows immediate termination by either Lockheed or BTN at any time prior to closing. The sole exception to this prerogative is if the closing is not consummated by January 15 because of the terminating party's breach of any of the representations or warranties or its failure to perform the covenants or agreements contained in the Transaction Documents. Section 11.01(d) is an alternative termination provision, not dependent on the failure of the deal to close by January 15. It allows termination because of a breach of any representation, warranty, covenant, or agreement under the Transaction Documents, if the effect of the breach "would cause the closing conditions of the terminating party not to be capable of being satisfied," and if the breach is not cured by the breaching party within 15 days of receiving written notice of the breach from the terminating party.

The parties agree that Maryland law governs the contract.

BTN began to install new phones and signs at MMC, obtained insurance coverage, and secured signed acceptances of employment

from the designated MMC employees. Sherlock also contacted Joseph Franchetti about a possible loan of $200,000 or more for working capital. The terms of the proposed loan were, however, onerous: the interest rate on the loan would be 20%; Franchetti would be entitled to 10% of net profit after taxes and would become a board member with a monthly retainer.

The Lockheed/BTN deal did not close on January 3, 2000, and on January 5, Lockheed's in-house counsel sent a handwritten note to Sherlock listing open action items, including "evidence of financial capability." On January 7, 2000, BTN's attorney forwarded to Lockheed's outside counsel materials addressing some of the open action items. Included was a letter from GE Capital to Sherlock stating that it was "in the process of completing [the] review of [Sherlock's] request for a $750,000 working capital line." GE Capital asked for a copy of the executed purchase agreement, and "[v]erification from Lockheed management as to the invoicing and payment terms." It further proposed a January 10 meeting. The meeting did not occur.

On January 12, Sherlock's consultant calculated that BTN would require $218,000 in working capital to operate MMC for the first month. At a meeting with Sherlock on January 12, Lockheed said that a $600,000 letter of credit would satisfy BTN's obligations under § 9.03(c)(iii) of the contract. Sherlock indicated that he would look into the issue and intended to talk to his attorney

6

about whether he needed to post additional funds.

By January 14, Sherlock had tendered $50,000 of the $100,000 down payment. On January 14, Lockheed sent Sherlock a letter informing him that, pursuant to the terms of the agreement, Lockheed would exercise its termination rights unless Sherlock had provided, by January 15, the remaining $50,000 of the down payment and "written evidence that [BTN] has access to a minimum of $600,000" via a signed letter of credit. Sherlock's attorney replied that the requirement of proof of access to $600,000 "appears to be a breach of the transaction agreements," but that Sherlock was ready, willing, and able to forward by wire transfer the remaining balance of the downpayment. On January 15, Sherlock wrote to Lockheed offering to contact banks to get financing and offering as collateral his vacation home, which he valued at $1.6 million.[1] Lockheed terminated the agreement by letter dated January 18, 2000.

Lockheed later sold MMC to another purchaser, PGM. BTN points to evidence of phone calls between Lockheed and PGM during early January 2000 as suggesting that Lockheed was negotiating a deal with PGM before the termination of the BTN deal.

---

[1]Sherlock's actual equity in the house appears to have been significantly less than that. In his April 2000 Petition for Bankruptcy, Sherlock valued the property at $900,000, and noted a $750,000 mortgage on the property.

In January 2001, BTN, BTI, and Sherlock filed suit against Lockheed in the United States District Court for the District of Maryland, asserting breach of contract and various tort claims. Lockheed filed counterclaims against BTN, BTI, and Sherlock. In May 2001, Sherlock filed a Suggestion of Bankruptcy, and, in August 2001, the district court ordered the case to go forward except as to the counterclaim against Sherlock.[2]

By February 2004, BTN's remaining claims against Lockheed were for breach of contract, detrimental reliance, breach of confidential duty, fraud, conspiracy to defraud, and tortious interference with prospective business relations. On February 25, 2004, the district court granted Lockheed's motion for summary judgment on these claims, and denied BTN's motion for partial summary judgment on its breach of contract claim. In an order dated May 5, 2004, the district court dismissed with prejudice Sherlock's and BTI's claims against Lockheed; dismissed without prejudice Lockheed's counterclaims against BTI and Sherlock; designated the February 25, 2004 Order as the final judgment as to BTN's claims; and stayed Lockheed's counterclaim against BTN pending BTN's appeal to this court. Only BTN appeals; it appeals the grant of summary judgment on the breach of contract and tort

---

[2]Sherlock's Petition for Bankruptcy in the District of New Jersey has since been voluntarily dismissed.

claims, and the denial of its own motion for partial summary judgment on its breach of contract claim. BTN does not appeal the grant of summary judgment on the quasi-contract claim of detrimental reliance.

## III.

We review the district court's grant of summary judgment <u>de novo</u>, viewing the facts in the light most favorable to the non-moving party. <u>Blaustein & Reich v. Buckles</u>, 365 F.3d 281, 286 (4th Cir. 2004).

## A.

As the district court correctly noted, Maryland law holds that no duty arises under a contract if a condition precedent is unfulfilled. <u>See</u> <u>Laurel Race Course, Inc. v. Regal Constr. Co.</u>, 333 A.2d 319, 327 (Md. 1975). Thus, if BTN did not satisfy the conditions precedent of §§ 9.03(a) and 9.03(c)(iii), and its nonperformance is not excused, it cannot recover for breach of contract, and the district court properly granted summary judgment to Lockheed. <u>See</u> <u>Hubler Rentals, Inc. v. Roadway Express, Inc.</u>, 637 F.2d 257, 260-61 (4th Cir. 1981).

(1)

The record reveals that BTI and BTN did not satisfy § 9.03(a) or § 9.03(c)(iii).

As to § 9.03(a), contrary to the representations and

9

warranties in §§ 4.01(e) & (h), neither BTN nor BTI had sufficient resources and assets at the time of the transactions to conduct MMC's business or to consummate the contemplated transactions. Indeed, BTN had no assets at all when the Transaction Agreement became effective on December 23, 1999, and would not have had any until the transfer of MMC's assets to BTN's control, which was supposed to occur on January 6, 2000. Moreover, there was an outstanding judgment of foreclosure of more than $1 million against BTI, and BTI's bank account had a negative balance.

Nor did BTN or BTI satisfy § 9.03(c)(iii). That section of the contract requires BTN to provide Lockheed with "reasonable assurances" that BTN had sufficient financial resources available to satisfy the Note and perform its obligations under the contract. BTN argues that there are material factual issues as to whether it satisfied this condition precedent, because (1) the Security Agreement in and of itself could constitute the required "reasonable assurances;" or (2) "Sherlock was prepared to complete the down payment, . . . BTN had already taken major steps toward assuming the business, . . . Lockheed had discussed the short-term working capital needs of BTN with Franchetti, who was willing to meet them . . . , and . . . the MMC deal was otherwise self-financing."

But it is a fundamental principle of contract law that a contract should be construed so that each provision has meaning,

10

and no provision is mere surplusage.  See, e.g., <u>JMP Assocs. v. St. Paul Fire & Marine Ins. Co.</u>, 693 A.2d 832, 834-35 (Md. 1997).  If we should construe the Security Agreement (or any other obligation in the Transaction Documents) to have satisfied the "reasonable assurances" requirement, then that would render § 9.03(c)(iii) superfluous.  Section 9.03(c)(iii) requires "reasonable assurances" <u>in addition to</u> the other requirements of the contract.

Moreover, BTN's signage and potential contracts did not assure "sufficient financial resources" to meet BTN's obligations, especially in the short-term.  Similarly, the understanding that the deal would become self-financing did not assure that BTN had the working capital to run the shop for the first month or two.  And Sherlock never offered the potential Franchetti loan to Lockheed as a "reasonable assurance."  Thus, these factors could not constitute "reasonable assurances."

The only counterproposal that Sherlock made to Lockheed's request for a $600,000 letter of credit was to offer his vacation home as collateral.  According to Sherlock's bankruptcy petition, this house was worth $900,000 and was encumbered by a $750,000 mortgage.  Even if the bare offer of this house as collateral could be considered an assurance, the value of that property was significantly less than the $218,000 that Sherlock's own consultant stated would be needed to run the shop for the first month.  Thus, it could not have been a "reasonable assurance" that BTN had

11

sufficient resources to satisfy the $400,000 Note and the other obligations under the agreement.

Because BTI and BTN did not satisfy the conditions precedent of §§ 9.03(a) and § 9.03(c)(iii), Lockheed did not have a duty to perform under the contract.

(2)

Alternatively, BTN argues that Lockheed repudiated the contract in its January 14, 2000 letter, thus excusing BTI's and BTN's failure to fulfill the conditions precedent, and consequently allowing BTN to recover for Lockheed's asserted anticipatory breach.[3]  The January 14 letter stated that "per terms of [the] agreement," if, by close of business January 15, 2000, Sherlock did not tender the remainder of the down payment and submit "written evidence that [BTN] has access to a minimum of $600,000 via a

---

[3]BTN also argues that Lockheed fraudulently concealed material information and did not negotiate in good faith, because, *inter alia*, Lockheed was allegedly simultaneously negotiating with PGM. BTN asserts that this excused it from performing the conditions precedent.  However, there is no authority for BTN's suggestion that there is a generalized fraud exception to the rule that the failure of a party to perform conditions precedent excuses the other party from its performance under the contract.  Of course, if a party's fraud or bad faith _causes_ the other party to be unable to perform a condition of the contract, then the nonperformance of the condition is excused.  _See_ Williston on Contracts § 39.10 (4th ed.) ("Although it is not necessary that there be a specific malevolent intent, the weight of authority holds that in order for prevention to constitute an excuse for nonperformance of a condition or a promise, the preventing party must have deliberately taken steps to impede performance or have arbitrarily impaired the other party's ability to perform.").  However, BTN fails to show that Lockheed's alleged fraud or bad faith _caused_ BTN's failure to provide reasonable assurances as required under § 9.03(c)(iii).

12

signed Letter of Credit" from a bank, Lockheed would "have no alternative but to terminate the deal."

"Ordinarily, in order to constitute anticipatory repudiation, there must be a definite, specific, positive, and unconditional repudiation of the contract by one of the parties to the contract." C.W. Blomquist & Co. v. Capital Area Realty Investors Corp., 311 A.2d 787, 791 (Md. 1973). A party repudiates a contract if it demands performance to which it is not entitled, and states unequivocally that it will not perform unless the demand is satisfied. WBZE, Inc. v. Arab Network of America, 220 B.R. 568, 572 (D. Md. 1998) (citing Corbin on Contracts § 973 at 910 (1951)).

Section 11.01(b) of the contract entitled Lockheed to "reasonable assurances" by January 15, 2000; without such assurances either party could unilaterally and immediately terminate. Lockheed's request that BTN establish a $600,000 line of credit did not amount to a repudiation of the contract if that request plausibly constituted a request for "reasonable assurances" under the contract. See LAK, Inc. v. Deer Creek Enters., 976 F.2d 328, 332-34 (7th Cir. 1992) (holding that, in determining whether there was an anticipatory breach, the court must look to the provision of the contract under which the dispute arises and determine whether the allegedly breaching party was "offering to perform in accordance with its own interpretation" of that provision and if "that interpretation was plausible").

13

In this case, Lockheed's determination that a $600,000 line of credit would satisfy § 9.03(c)(iii) was neither implausible, nor even unreasonable. The contract required "reasonable assurances" that BTN could pay the $400,000 Note and satisfy the other obligations of the contract, which included the running of the machine shop. As explained above, the Security Agreement, which secured the Note, could not in itself satisfy the "reasonable assurances" requirement. Lockheed requested a line of credit that equaled the amount of the Note, plus $200,000, an approximation of the amount necessary to run the shop for one month--and it is undisputed that it would be at least one month before the shop could realize a profit. Moreover, as evidence of ability to meet BTN's financial obligations, Sherlock had proffered a letter indicating that he had requested a $750,000 line of credit from GE Capital. Thus, Sherlock himself seems to have contemplated that a line of credit for $150,000 more than Lockheed eventually demanded might be necessary to provide "reasonable assurances."

Finally, Lockheed can only have repudiated the contract if BTN was ready and willing to provide "reasonable assurances" by the January 15 deadline. See Wischhusen v. Am. Med. Spirits Co., 163 A.2d 685, 687 (Md. 1933). To provide these assurances, Sherlock would, at least, have had to accept Franchetti's loan. However, not only was Sherlock unwilling to accept the loan, but also both he and his attorney repeatedly expressed a belief that Sherlock was

14

obligated to do no more under the contract than tender the down payment. BTN's contention that Sherlock would ultimately have accepted the Franchetti loan is belied by the fact that he did not do so before the close of business on January 15, 2000, although Lockheed had informed him that it would likely exercise its termination rights if the deal had not closed by that deadline.

Because Lockheed did not repudiate the contract, repudiation does not excuse BTN's failure to satisfy the conditions precedent, and BTN cannot maintain a suit for breach of contract.[4]

## B.

BTN also appeals the district court's grant of summary judgment to Lockheed on BTN's tort claims. We have reviewed the record, briefs, and applicable case law, and we have heard oral argument. We are convinced that the district court properly resolved these claims. See Sherlock v. Lockheed Martin Corp., Civil Action No. AW-01-254 (D. Md. Feb. 25, 2004).

## IV.

For these reasons, the judgment of the district court is

AFFIRMED.

---

[4]Our resolution of this issue also disposes of BTN's appeal of the district court's denial of its motion for partial summary judgment on the breach of contract claim.

15